# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Arlander Keys | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 03 C 2891 | **DATE** | 4/16/2004 |
| **CASE TITLE** | Ferere vs. JoAnne Barnhart | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

## DOCKET ENTRY:

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Memorandum Opinion and Order entered. Plaintiff's Motion for Summary Judgment [#10] **is granted**; Defendant's Motion for Summary Judgment [#12] is **denied**. The Court remands the case back to the Commissioner for further proceedings consistent with this Opinion. *AK*

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | **2** | **Document Number** |
| | No notices required. | | number of notices | |
| ✓ | Notices mailed by judge's staff. | | | |
| | Notified counsel by telephone. | | APR 19 2004 | |
| | Docketing to mail notices. | | date docketed | **14** |
| ✓ | Mail AO 450 form. | | | |
| | Copy to judge/magistrate judge. | | 4/16/2004 | |
| | | | date mailed notice | |
| FT/*Dloy* | courtroom deputy's initials | | FT | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

DOCKETED

APR 1 9 2004

MARY F. FERERE,               )
                              )
            Plaintiff,        )
                              )
     v.                       )     Case No. 03 C 2891
                              )
JO ANNE B. BARNHART,          )     Magistrate Judge Arlander Keys
Commissioner of Social        )
Security,                     )
                              )
            Defendant.        )

## MEMORANDUM OPINION AND ORDER

Mary Ferere, now 37 years old, suffers from depression and
an anxiety disorder. She alleges that those impairments,
combined with an injury to her right knee sustained in September
of 2000, prevent her from being able to hold down a job. On
March 19, 2001, she applied to the Social Security Administration
("SSA") for Disability Insurance Benefits, but the SSA denied her
application. After unsuccessfully pursuing an appeal through the
SSA's processes, Ms. Ferere filed suit in this Court, seeking
review of the decision to deny her benefits. The case is before
the Court on cross-motions for summary judgment.

### Facts & Procedural History

Mary Ferere applied for Disability Insurance Benefits on
March 19, 2001, claiming that, as of October 7, 2000, she was
unable to work because of depression, anxiety, an injured right

knee, and hypertension. Record at 57. The SSA denied her claim initially on July 17, 2001, and upon reconsideration on November 7, 2001. Record at 24-27, 29-31. After she requested a hearing, her case was assigned to Administrative Law Judge Gerard J. Rickert, who held the requested hearing on September 23, 2002.

At the hearing before the ALJ, Ms. Ferere, who was represented by counsel, testified first. In response to questions from the ALJ, Ms. Ferere testified that she is 5'6" tall and weighs 250 pounds, and that she lives with her disabled husband and her two minor daughters in a house owned by her parents. *Id.* at 143-45. She testified that she graduated from high school, and then took some general business courses at a junior college. *Id.* at 145.

With respect to her past work experience, Ms. Ferere testified that she had worked as a lab technician for Silliker Labs from June of 1983 until October of 2000, when she was fired because her "illness was taking longer than [the company] anticipated." Record at 146. She testified that she has not worked at all since leaving the lab. *Id.* Ms. Ferere testified that, as a lab technician, she was responsible both for physically setting up research studies or experiments, and for analyzing and reporting the research data and findings; the job required her to spend most of the day on her feet and to lift up to 15 pounds on a daily basis. *Id.* at 160-62.

2

With respect to her impairments, Ms. Ferere first testified that she suffers from an injured right knee and from hypertension. She testified that her knee still bothers her "[f]rom time to time," that it throbs if she walks long distances or if the weather changes, and that she is unable to put too much weight on it; she testified that sometimes when she walks up stairs, her knee feels like it is going to "collapse." *Id.* at 147-48, 155. She admitted, however, that her knee problem was not what was preventing her from working. *Id.* at 155. In fact, she testified that she was no longer under a doctor's care for her knee, and that she had not seen a doctor about her knee for at least a year. *Id.* at 148. She also testified that her hypertension was controlled with medication. *Id.* Along those lines, she testified that, at the time of the hearing, she was taking Zestril for her blood pressure and Zoloft for her depression and anxiety; she also testified that she took Ativan on an as-needed basis, about three times a week, and that she took Tylenol to relieve her knee pain. *Id.* at 147-48.

Ms. Ferere testified that she also suffers from depression and anxiety, which surfaced shortly before she stopped working. Record at 148. She testified that she had been seeing a psychiatrist once a month, and was in the process of being set up with a therapist. *Id.* at 149. With respect to the symptoms of her depression, she testified that she "feel[s] very down," she

3

thinks about harming herself, feels guilty or worthless almost every day, and has trouble sleeping at night, often waking in the middle of the night; she testified that some days she simply cannot function because the medication makes her so tired. *Id.* at 149-51. She testified that her mind races and she has difficulty concentrating or thinking, she is less interested in things than she should be, and she has panic attacks a couple of times a week, which generally last about 10 to 15 minutes. *Id.* at 150, 157. She testified that, when she is experiencing a panic attack, she has to either go outside to get some air or think pleasant thoughts. *Id.* at 157. She testified that she used to feel like somebody was watching her, and she experiences auditory hallucinations "once in a great while." *Id.* at 156. She testified that she experiences headaches, has trouble making quick decisions, and has a hard time handling the daily stresses of life; she testified that her husband's health issues, issues relating to her children and her home life make her feel "very nervous and shaky inside." *Id.* at 158-59.

With respect to her daily activities, Ms. Ferere testified that, in a typical day, she wakes up around 7:00 a.m., naps from about 10:00 a.m. until about 3:00 p.m., and then goes to bed around 10:00 or 11:00 p.m. Record at 151, 157. She testified that she does very little housework (some sweeping, maybe a little mopping), and prepares basically only microwave meals; her

4

husband does most of the cooking and the laundry. *Id.* at 151. She testified that she will drive short distances, but is afraid to drive alone because of her panic attacks. *Id.* at 152. She testified that she has no hobbies, rarely visits with friends or neighbors and is not active in her kids' schools or any other organizations, though she does attend her kids' parent/teacher conferences; she watches very little television, does not read, attends church only about once a month, and no longer uses her home computer. *Id.* at 152-53. She testified that she spends most of her time sleeping and maybe walking a little; she is able to bathe and dress herself. *Id.* at 153.

After Ms. Ferere testified, the ALJ heard from Thomas Grzesik, a vocational expert. Initially, the ALJ asked VE Grzesik how he would characterize Ms. Ferere's past work and whether, in his opinion, she was still able to perform that work. On the former, VE Grzesik testified that he would characterize Ms. Ferere's past work as "light in physical demand and semiskilled," and, on the latter, he testified that she was no longer capable of doing that job. Record at 163-64.

Next, the ALJ asked VE Grzesik whether, given her limitations, Ms. Ferere might be able to do other jobs. Specifically, the ALJ asked the VE to consider what jobs might be available for someone who: (1) was 36 years old; (2) had completed high school and taken a few college courses; (3) had

5

Ms. Ferere's past work experience; (4) was limited on an exertional basis to the light level of exertion; (5) could lift no more than 10 pounds frequently or 20 pounds occasionally; (6) suffers deficiencies in concentration such that she is limited to relatively simple repetitive tasks involving, at most, two or three steps; and (7) because of anxiety concerns, cannot engage in work activity that involves significant dealings with the general public or "stiff time/rate productions pressures." Record at 163-64. VE Grzesik testified that a person described as such would be able to work as a material handler, a machine tender or a hand packager, and that all of those jobs existed in relative abundance in the Chicago area. *Id.* at 165. VE Grzesik clarified, however, that none of these jobs – nor any other jobs in the economy as far as he knew – would accommodate a lengthy nap in the middle of the workday. *Id.* at 165-66. He also testified that, if Ms. Ferere needed more than three breaks in the course of the day or needed prolonged breaks during the workday, she was essentially unemployable. *Id.* at 166. Additionally, in response to questions from Ms. Ferere's attorney, VE Grzesik testified that the types of jobs he identified might not be available to someone who was unable to maintain attention and concentration for extended periods, to someone who was unable to perform activities within a schedule, or maintain regular attendance and be punctual, to someone who

6

was unable to sustain an ordinary routine without special supervision, or to someone who became distracted when working with or near others. Record at 167-68. Finally, VE Grzesik testified that the need to withdraw from the workplace because of panic attacks, even as seldom as one time per week, could impact a person's ability to perform any job. *Id.* at 169.

In addition to the testimony given by Ms. Ferere and VE Grzesik, the ALJ considered medical records documenting Ms. Ferere's impairments, including progress notes and assessments from Ms. Ferere's treating psychiatrist, Dr. Aida Spahic-Mihajlovic. The record contains a psychiatric report, completed by Dr. Spahic-Mihajlovic at the behest of the SSA on April 20, 2001, indicating that she saw Ms. Ferere on a monthly basis beginning January 9, 2001. Record at 91. In that report, Dr. Spahic-Mihajlovic noted that Ms. Ferere had complained of sluggishness, tearfulness, sleep disruption, significant weight loss and anhedonia[1], all worsening over time since about September of 2000. *Id.* According to Dr. Spahic-Mihajlovic, Ms. Ferere reported having difficulty caring for herself and her children, and working outside the home. *Id.* She indicated that Ms. Ferere suffered from a major depressive disorder, moderate to severe, and from a panic disorder, and she indicated that,

---

[1]Anhedonia refers to the "total loss of feeling of pleasure in acts that normally give pleasure." Dorland's Illustrated Medical Dictionary, p. 80 (26th ed. 1985).

because of these disorders, Ms. Ferere would "likely have difficulty interacting w/co-workers, responding to supervision & managing typical work stressors." *Id.* at 93. Despite this, Dr. Spahic-Mihajlovic noted that Ms. Ferere's thought processes, memory and mental capacities were within normal limits. *Id.* at 92-93.

The record also contains Dr. Spahic-Mihajlovic's progress notes, the notes she made documenting each appointment she had with Ms. Ferere. In all, the record contains progress notes from fifteen appointments, beginning on January 9, 2001 and ending on July 15, 2002. A patient intake form from the first appointment on January 9 indicates that Ms. Ferere was referred to Dr. Spahic-Mihajlovic for depression, and that her chief complaints at the time were sluggishness, low morale, crying everyday, sleep disturbances (including difficulty falling asleep and early morning waking), weight loss, and anhedonia. Record at 112. At the time, Dr. Spahic-Mihajlovic indicated that Ms. Ferere had a GAF score of 70, *id.* at 114, meaning that she put her at a 70 on the Global Assessment of Functioning Scale, a "hypothetical continuum of mental health-illness." Diagnostic and Statistical Manual of Mental Disorders, p. 32 (4th ed. 1994). A score of 70 would put Ms. Ferere at the uppermost (healthiest) end of the range indicating "**[s]ome mild symptoms** (e.g., depressed mood and mild insomnia) **OR some difficulty in social, occupational, or**

**school functioning** (e.g., occasional truancy, or theft within the household), **but generally functioning pretty well, has some meaningful interpersonal relationships.**" *Id.* (emphasis in original).

The record shows that Dr. Spahic-Mihajlovic next saw Ms. Ferere on February 2, 2001; at that time, Dr. Spahic-Mihajlovic noted that Ms. Ferere's orientation, speech, memory, thought processes, affect and judgment were all within normal limits, her attention and concentration were good, her associations were intact, and she had no suicidal or homicidal ideations. Record at 116. In fact, the only negative symptoms noted in the February progress notes were medication-related headaches (which Dr. Spahic-Mihajlovic addressed), a depressed mood, and problems with tremors. *Id.* As with the last visit, Dr. Spahic-Mihajlovic recommended that Ms. Ferere return in one month for a follow-up visit, and Ms. Ferere next saw Dr. Spahic-Mihajlovic on March 12, 2001. According to the progress notes from that appointment, Ms. Ferere's condition was essentially unchanged, except that Dr. Spahic-Mihajlovic now characterized her mood as depressed and anxious (not just depressed). Record at 117. Dr. Spahic-Mihajlovic also noted that Ms. Ferere reported experiencing dizzy spells. *Id.* In the "Follow-Up Plan" section of the notes, Dr. Spahic-Mihajlovic indicated that Ms. Ferere would return for a follow up visit in one month and continue on long term disability

for another one to two months.  *Id.*

The record shows that Ms. Ferere next saw Dr. Spahic-Mihajlovic on May 2, 2001.  According to the progress notes from that appointment, Ms. Ferere's condition was unchanged, except that she described her mood as more anxious than depressed.  *Id.* at 118.  At that appointment, Ms. Ferere reported that she had been fired from her job, and that she had experienced a panic attack about two weeks prior to the appointment.  *Id.*  Ms. Ferere next saw Dr. Spahic-Mihajlovic on June 4, 2001.  The notes from that day indicate, again, that Ms. Ferere's condition was largely the same.  Although she apparently reported feeling "more depressed," Dr. Spahic-Mihajlovic indicated that her orientation, speech, movement, memory, attention, thought processes, affect, mood and judgment were all within normal limits, her associations were intact and she was experiencing no suicidal or homicidal ideations.  *Id.* at 119.  Progress notes from June 27, 2001 show that Ms. Ferere reported experiencing headaches, mood swings and anxiety attacks, and continued to express concern about her medication.  *Id.* at 120.  Again, Dr. Spahic-Mihajlovic indicated that her orientation, speech, movement, memory, attention, thought processes, affect, mood and judgment were all within normal limits.  *Id.* at 119.  Progress notes from July 23, 2001 indicate that Ms. Ferere reported feeling depressed and that she was "still crying"; Dr. Spahic-Mihajlovic noted that Ms. Ferere's

10

mood was depressed, but otherwise placed her within normal limits. *Id.* at 121. Progress notes from August 20, 2001 indicate that Ms. Ferere reported her anxiety attacks were worsening; she reported feeling very down and depressed, and feeling that she "can't go back to work at this time." *Id.* at 122. Despite these reports from her patient, Dr. Spahic-Mihajlovic indicated that Ms. Ferere's mood was within normal limits. *Id.* According to Dr. Spahic-Mihajlovic's progress notes from September 19, 2001, Ms. Ferere reported that her anxiety attacks were triggered by her medication. *Id.* at 123. On that date, Dr. Spahic-Mihajlovic indicated that Ms. Ferere's mood was depressed but that everything else was within normal limits. *Id.* In the September 19 progress notes, Dr. Spahic-Mihajlovic also indicated that Ms. Ferere had been on disability for the last six months, and that she was going to suggest that Ms. Ferere go back to work on a part-time basis. *Id.* Progress notes from October 20, 2001 indicate that Ms. Ferere's mood continued to be depressed, and that her attention had slipped to fair; otherwise, Dr. Spahic-Mihajlovic placed Ms. Ferere within normal limits. *Id.* at 124. Progress notes from December 17, 2001 show that Ms. Ferere was feeling "down in the dumps" and forgetful; she was experiencing anxiety once a week and having a little trouble sleeping. *Id.* at 125. Dr. Spahic-Mihajlovic indicated that Ms. Ferere's mood was depressed and that her affect was blunted, but

11

that she was otherwise within normal limits. *Id.* Progress notes from January 30, 2002 show that Ms. Ferere was feeling "sluggish, depressed," "confused," and "not with it," and that she had just learned that her husband had cancer. *Id.* at 126. Dr. Spahic-Mihajlovic indicated that Ms. Ferere's attention had slipped to fair, her associations were now only loose (not intact), she was experiencing some abnormal thoughts (preoccupations), and her mood was depressed. *Id.* The record shows that, by March 25, 2002, Ms. Ferere's associations were once again intact; her attention remained fair, her affect remained flat, her mood remained depressed and she continued to experience preoccupations. *Id.* at 127. By May 13, 2002, her attention, affect, and mood were once again within normal limits, her associations were once again intact and she was no longer having abnormal thoughts. *Id.* at 128.

The latest progress notes in the record are dated July 15, 2002. On that date, Dr. Spahic-Mihajlovic indicated that Ms. Ferere's affect was once again blunted, but everything else was within normal limits. *Id.* at 130. Dr. Spahic-Mihajlovic instructed Ms. Ferere to return in two months, *id.*, though any later appointments would have been beyond the scope of the record, which was closed on the date of the hearing. Also on July 15, Dr. Spahic-Mihajlovic prepared an "Individualized Treatment Plan" with Ms. Ferere, confirming the major depressive

disorder and panic disorder diagnosis and reiterating the GAF score of 70. *Id.* at 131. In the Plan, Dr. Spahic-Mihajlovic indicated that Ms. Ferere's depressed mood and somatic complaints were moderately severe, and that her functional disturbance level was mild in severity. *Id.*

Finally, the record contains Psychiatric Review Technique and Mental Residual Functional Capacity Assessment forms prepared by Dr. Terry Travis on June 21, 2001. Record at 94-111. On the Psychiatric Review Technique form, Dr. Travis confirmed that Ms. Ferere suffers from depression and anxiety disorders, and he indicated that, in his view, she is mildly limited in daily living activities, and in her ability to maintain concentration, persistence or pace, and moderately limited in social functioning abilities. Record at 104. On the Mental Residual Functional Capacity Assessment form, Dr. Travis indicated that, in his view, Ms. Ferere was "not significantly limited" in most aspects of the categories defined as "understanding and memory," "sustained concentration and persistence," and "social interaction," and that she was "not significantly limited" in all aspects of "adaptation." *Id.* at 108-09. Dr. Travis indicated that Ms. Ferere was "moderately limited" in a few areas, including her ability to understand, remember and carry out detailed instructions, her ability to maintain attention and concentration for extended periods, her ability to interact appropriately with

the general public, and her ability to get along with coworkers
or peers without distracting them or exhibiting behavioral
extremes. *Id.* Dr. Travis' assessments were affirmed by Dr.
Erika B. Altman, who reviewed the record and the assessments for
the SSA on October 26, 2001. *Id.* at 94, 110.

The ALJ issued his decision on October 25, 2002, finding
that Ms. Ferere was not disabled and denying her claim for
benefits. In particular, the ALJ found that, although Ms. Ferere

> has a "severe" affective and anxiety disorder, the
> record does not contain evidence that satisfies both
> sections A and B, or section C of the Listings.
> Specifically, with respect to the claimant's affective
> disorder, the record does not show repeated episodes of
> decompensation, a residual disease process, or a
> current history of inability to function outside of a
> highly supportive living arrangement. With respect to
> the claimant's anxiety disorder, the record does not
> show a complete inability to function independently
> outside her home as contemplated by section 12.06C.

Record at 16. The ALJ determined that Ms. Ferere's primary
impairments were anxiety and depression, but found that those
impairments were not, as characterized by her treating
psychiatrist, totally debilitating. Record at 17. The ALJ
recognized that Ms. Ferere "may have 'moderate' difficulty with
social interactions and the ability to concentrate and attend,
however. *Id.* at 18. And, accordingly, he determined that "she
should be limited to simple, repetitive work activity [and]
should not have sustained dealing with the general public [or]
perform work that requires time/rate pressures." *Id.* Given

14

these limitations, the ALJ concluded that Ms. Ferere could not perform her past relevant work as a lab technician. *Id.* He agreed with the VE, however, that Ms. Ferere was still capable of performing a significant number of other jobs, including that of material handler, machine tender and hand packager. *Id.*

The ALJ's decision became the final agency decision when the Appeals Council denied review on March 6, 2003. *See* 20 C.F.R. §416.1481. Ms. Ferere then filed this lawsuit, seeking review of the agency's decision and an award of benefits. The parties consented to proceed before a magistrate judge, and the case was reassigned to this Court on July 3, 2003. Thereafter, both parties moved for summary judgment. Ms. Ferere asks the Court to reverse the Commissioner's denial of her claim for benefits, or, in the alternative, to remand the case to the Commissioner for further proceedings. The Commissioner has filed a cross-motion for summary judgment, asking the Court to affirm the ALJ's findings.

## Discussion

Disability Insurance Benefits are available only to claimants who can establish "disability" under the terms of the Social Security Act. The social security regulations provide a five-step sequential analysis for determining disability for purposes of eligibility for benefits. Under the regulations, the ALJ is required to evaluate, in sequence, (1) whether the

claimant is currently employed; (2) whether the claimant has a
severe impairment; (3) whether the claimant's impairment meets or
equals one of the impairments listed by the Commissioner in 20
C.F.R. Part 404, Subpart P, Appendix 1; (4) whether the claimant
can perform her past work; and (5) whether the claimant is
capable of performing work in the national economy. *Clifford v.
Apfel*, 227 F.3d 863, 868 (7th Cir. 2000) (citing *Knight v.
Chater*, 55 F.3d 309, 313 (7th Cir. 1995)). The claimant bears
the burden of proof at steps one through four; at step five, the
burden shifts to the Commissioner. *Id.* (citing *Knight*, 55 F.3d
at 313).

A district court reviewing an ALJ's decision under the above
analysis must affirm if the decision is supported by substantial
evidence and free of legal error. 42 U.S.C. § 405(g); *Steele v.
Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002). Where, however,
"the Commissioner's decision lacks evidentiary support or is so
poorly articulated as to prevent meaningful review, the case must
be remanded." *Steele*, 290 F.3d at 940. In the Seventh Circuit,
an ALJ must "build an accurate and logical bridge from the
evidence to [his] conclusions so that [the Court] may afford the
claimant meaningful review of the SSA's ultimate findings."
*Blakes ex rel. Wolfe v. Barnhart*, 331 F.3d 565, 569 (7th Cir.
2003). It is not enough that the record contains evidence to
support the ALJ's decision; if the ALJ does not rationally

articulate the grounds for that decision, the Court must remand. *Steele*, 290 F.3d at 941.

Applying the five-step analysis spelled out above, ALJ Rickert first determined that Ms. Ferere had not engaged in substantial gainful activity since her alleged onset date. Record at 15. At step two, the ALJ found that Ms. Ferere suffered from a combination of impairments – notably, degenerative joint disease of the right knee, depression and anxiety, obesity and high blood pressure – that was "severe" within the meaning of the Social Security Act and Regulations. *Id.* at 15-16. But, the ALJ found, her impairments did not meet or medically equal a listed impairment. *Id.* at 16. As a predicate to his findings at steps four and five, the ALJ determined that Ms. Ferere "should be limited to simple, repetitive work activity"; that she "should not have sustained dealing with the general public and she should not perform work that requires time/rate pressures." Record at 18. Based on that assessment, the ALJ determined that Mr. Ferere was incapable of performing her past relevant work as a lab technician. *Id.* He concluded, however, that given her age, education and functional limitations, she could still perform a significant number of light, unskilled jobs in the national economy, and was, therefore, not disabled and not entitled to benefits. *Id.*

Ms. Ferere argues that the ALJ's decision must be reversed

17

or remanded for, essentially, two reasons: (1) the ALJ failed to give controlling weight to the mental functional capacity assessment given by Ms. Ferere's treating psychiatrist; and (2) the ALJ failed to consider certain evidence concerning the impact her impairments had on her daily life, as well as the testimony of the vocational expert concerning what affect her limitations would have on her ability to work. The Court considers each argument in turn.

As Ms. Ferere correctly points out, "[a] treating physician's opinion regarding the nature and severity of a medical condition is entitled to controlling weight if it is well supported by medical findings and not inconsistent with other substantial evidence." *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000) (citing 20 C.F.R. §404.1527(d)(2)). Unfortunately for Ms. Ferere, however, that does not appear to be the case here. On August 26, 2002, Dr. Spahic-Mihajlovic completed an SSA form entitled "Medical Source Statement of Ability To Do Work-Related Activities (Mental)," indicating that Ms. Ferere suffered from debilitating depression, sleep deficits and an anxiety/panic disorder. Record at 133. She further indicated that, as a result of those impairments, Ms. Ferere was largely unable to understand, remember and carry out instructions and largely unable to respond appropriately to supervision, co-workers, and work pressures in a work setting. *Id*. at 133-34. In particular,

Dr. Spahic-Mihajlovic noted, Ms. Ferere was "unable to handle even normal daily stress, mood swings, paranoia, persistent depression." *Id.* at 134. The ALJ gave this assessment little weight because, in his view, the conclusion that Ms. Ferere's impairments were totally debilitating was not supported by the evidence. Ms. Ferere's arguments notwithstanding, the Court finds that the ALJ's determination on this issue is supported by substantial evidence.

Dr. Spahic-Mihajlovic's progress notes, which appear to have been prepared either during or shortly after each appointment, cover the period from January 9, 2001 to July 15, 2002. And significantly, although certain aspects of her demeanor and mood may have gotten better or worse over time, the GAF score Dr. Spahic-Mihajlovic assigned to Ms. Ferere never changed during the course of treatment: Dr. Spahic-Mihajlovic put her at a 70 on January 9, 2001, and she put her at a 70 on July 15, 2002. Record at 114, 131. In short, nothing in the intake form, the initial progress notes, or any of the subsequent progress notes suggests that Dr. Spahic-Mihajlovic considered Ms. Ferere to be totally disabled; indeed, on March 12, 2001, she indicated that she thought Ms. Ferere would remain on disability for only another month or two, and, on September 19, 2001, she indicated that she thought Ms. Ferere should go back to work. Record at 117, 123.

19

The ALJ determined that, to the extent Dr. Spahic-Mihajlovic's work-related activities assessment indicated that Ms. Ferere was totally incapable of working, that assessment was unsupported in the record evidence, including Dr. Spahic-Mihajlovic's own notes and records. And, after reviewing the progress notes and the remainder of the record, the Court cannot say that that determination was unreasonable. Accordingly, the Court cannot upset the ALJ's decision on this basis.

Ms. Ferere next argues that the ALJ's decision should be reversed or remanded because he failed to address her allegations concerning pain and other symptoms, and because he failed to consider whether, and to what extent, these symptoms would affect her ability to hold down a job. Here, the Court must agree.

At the hearing, Ms. Ferere testified that she spent half of her day sleeping, that she starts feeling really drowsy around 10:00, three hours after she wakes up, and that then she doesn't get up until about 3:00 in the afternoon. Record at 153, 157. She also testified that she experiences panic attacks, on average, a couple of times a week. *Id.* at 150. And, significantly, the VE testified that, panic attacks occurring even once a week, if they occurred outside of a scheduled break, might preclude gainful activity. Record at 169. He also testified that no job in the national economy would accommodate the need for a prolonged nap in the middle of the day. *Id.* at

20

165.  Thus, if the testimony of Ms. Ferere and the VE is to be believed, Ms. Ferere is precluded from holding down *any* job.

In his decision, the ALJ did not specifically address the evidence and testimony about Ms. Ferere's alleged nap requirements and panic attacks.  And while the parties seem to think that the ALJ chose not to mention this evidence because he disbelieved Ms. Ferere's testimony, the Court is unable to determine whether that is, in fact, the case.  The ALJ discussed Ms. Ferere's credibility with respect to her knee pain, but he did not discuss her credibility with respect to her testimony about her depressive symptoms.  And while an ALJ's credibility determinations are generally entitled to substantial deference, that is true only when the ALJ explicitly makes such findings and explains them in a way that affords meaningful review.  *See* *Steele v. Barnhart*, 290 F.3d 936, 942 (7th Cir. 2002); Social Security Ruling 96-7p (1996).  *See also Zblewski v. Schweiker*, 732 F.2d 75, 78-79 (7th Cir. 1983)(Courts must defer to an ALJ's credibility determinations only when explicitly made and explained; it is not "merely 'helpful' for the ALJ to articulate reasons (e.g., lack of credibility) for crediting or rejecting particular sources of evidence . . .[i]t is absolutely essential for meaningful appellate review").  Here, the ALJ did not satisfy this standard.

Given the unrebutted testimony from the hearing, the ALJ

should have at least considered how Ms. Ferere's napping
requirements and panic attacks might have impacted her ability to
hold down a regular job, and he does not appear to have done so.
Moreover, to the extent the ALJ rejected Ms. Ferere's testimony
concerning her napping requirements and her panic attacks because
he found her to be less than fully credible, he was required to
explain his findings in this regard, and, again, he failed to do
so.

The Court recognizes that valid reasons may well exist to
doubt Ms. Ferere's testimony concerning her need to nap for five
hours each day and the frequency and impact of her alleged panic
attacks. But it is the ALJ's job, not the job of this Court, to
point to specific medical evidence that undermines Ms. Ferere's
testimony. The ALJ could have, for example, cited Dr. Spahic-
Mihajlovic's progress notes as evidence that Ms. Ferere reported
panic attacks occurring much less often, and that she did not
report any issues with napping impeding her ability to function.
He did not do so. In fact, as the Court has already noted, he
did not address the issue at all. This was inappropriate, and
the Court must, therefore, remand the case for further
proceedings.

### Conclusion

For the reasons set forth above, the Court finds that the
ALJ failed to build an accurate and logical bridge between the

record evidence and his ultimate conclusion that Ms. Ferere is capable of performing a substantial number of jobs in the national economy. In particular, he failed to explain how a person who requires a five-hour nap in the middle of the day, and who experiences panic attacks on average two times per week, could sustain regular employment. To the extent the ALJ found Ms. Ferere's testimony about her symptoms to be unbelievable, he failed to explain why this was so. Accordingly, the Court must grant Ms. Ferere's Motion for Summary Judgment, and deny the Commissioner's Motion for Summary Judgment. The matter is remanded for further proceedings consistent with this opinion.

Dated: April 16, 2004

ENTER:

_____
ARLANDER KEYS
United States Magistrate Judge